**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CRIMINAL ACTION NO. 13-12-DLB-JGW**

**UNITED STATES OF AMERICA**                                         **PLAINTIFF**

vs.               **<u>MEMORANDUM OPINION AND ORDER</u>**

**RONNIE E. FRISKEY**                                               **DEFENDANT**

\*\*\*    \*\*\*    \*\*\*    \*\*\*

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress (Doc. # 16) all evidence seized from his residence on November 13, 2012, pursuant to a search warrant he alleges was issued based upon unlawfully obtained evidence discovered when the officers allegedly exceeded the scope of a protective sweep of his basement (*id.*). After the motion was fully briefed, the Court held an evidentiary hearing on November 17, 2014. (Doc. # 20). Defendant Friskey was present at the hearing and represented by Attorney Steve Smith. The United States was represented by Assistant United States Attorney Tony Bracke. The hearing was recorded by Official Court Reporter Lisa Wiesman. At the conclusion of the hearing, Defendant's motion was submitted for decision (*id.*) For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 16) is hereby **denied.**

## II. FINDINGS OF FACT

Three witnesses testified during the evidentiary hearing. The United States called Kenton County Police Officers Gary Helton and Aaron Schihl. Defendant called DEA Task

Force Agent Andy Muse. Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing, the Court makes the following factual findings:

1. On Tuesday, November 13, 2012, Kenton County Police Officers Helton and Schihl were notified that the dispatch center had received a 911 call from someone reporting that a suspicious person was prowling around a residence on Mills Road in Kenton County. However, the 911 caller did not provide an exact address.

2. According to both officers, there had been a string of burglaries in and around that area.

3. Upon their arrival, Officers Helton and Schihl initially went to the wrong residence.[1] Suspecting there may have been a burglary in progress, they checked the perimeter of the house, found an unlocked door, and went inside to clear the residence. Upon finding no intruders, they exited the residence.

4. Upon exiting that house, the neighbor who had made the 911 call approached the officers and told them they had checked the wrong house. That person directed them to the house next door at 3277 Mills Road.[2] The complainant also explained that the suspicious vehicle was parked in the parking lot of St. Patrick's church across the street, and that a male had been walking around that residence, in the area of the front doors. The neighbor further explained that the vehicle and male were "out of ordinary" for the area.

5. The officers then proceeded to 3277 Mills Road to check and make sure there was no burglary in progress. From the location of windows that were low to the ground, the

---

[1] That house was the old rectory for St. Patrick's church.

[2] 3277 Mills Road is shown in Government Exhibit 1 which was admitted during the hearing.

officers also believed it was likely that there was a basement to the residence. Officer Helton went to the front door and Officer Schihl proceeded to the back door. Both doors were unlocked. For officer safety, the officers decided to make entry together through the front door.

6. Once the officers opened the front door and made entry into the residence, both noticed an extremely strong odor of marijuana.

7. After making initial entry into the residence, the officers proceeded to conduct a search for the male prowler that had been described to them, looking throughout the first floor of the residence with no success. The officers only looked in areas where a prowler may have been hiding.

8. Having no success in locating the suspected prowler, and believing there was a basement to the residence, the officers came across an alcove on the first floor which was described by Officer Schihl as a hallway that led to nowhere, and seemed out of place. Upon lifting the carpet back, the officers noticed a hidden door in the floor. Although neither officer was able to describe exactly how the carpet looked on top of the door when they saw it, both did explain that the photograph admitted as Exhibit 2 during the hearing was not how it looked when they initially saw it.

9. After discovering the door, and having not yet located the suspected prowler that had been reported to them as casing the residence, the officers proceeded to open the basement door. Upon opening the door, the smell of marijuana was even stronger than before. The officers also heard exhaust fans running.[3]

---

[3] Defendant has spent considerable time in his written motion and during the hearing arguing that the officers exceeded the permissible scope of the protective sweep because it would

10. Upon descending into the basement, the officers continued their search for the intruder with no success. While there they did observe a wall of plastic sheeting and both small and large marijuana plants in the basement.

11. After checking the basement to no avail, the officers did a second, quick sweep through the first floor to locate the prowler. That second sweep was also unsuccessful. This second sweep did not reveal anything they had not observed during their initial sweep.

12. At no point during the initial sweep of the residence did either officer recall seeing any firearms.

13. The officers thereafter exited the residence, secured the perimeter, and Officer Schihl departed to meet the Assistant Commonwealth's Attorney to attempt to obtain a search warrant for the residence. Around that same time frame Agent Muse arrived on the scene.

14. Upon his arrival, Agent Muse entered the residence for the purpose of investigating a crude device that had hoses and other objects sticking out of it. That device was discovered as the officers were conducting their sweep of the first floor. The officers weren't sure what it was and suspected it might be methamphetamine. Muse was called because of his extensive expertise in drug investigations. Upon viewing the device, Muse

---

have been impossible for someone to open the basement door to hide downstairs and replace the carpet so it would lay flat on top of the door as it was described by the officers. This argument is a red herring in the Court's view. The officers were trying to find a suspected prowler in a residence where a suspicious male subject had been observed earlier by a neighbor. They found a door to a basement and opened it with the intention of continuing to look for the intruder. The exact location of the carpet and the officers' thought processes regarding whether someone could open the basement door, walk down the stairs, and then shut the door so the carpet laid flat is simply not significant in the Court's view.

quickly determined it had nothing to do with a methamphetamine cook. He thereafter exited the residence to await the anticipated search warrant.

15. Approximately two hours later, Officer Schihl notified Officer Helton that the search warrant had been signed by Judge Ann Ruttle. A copy of the affidavit[4] in support of the search warrant and the warrant itself were admitted during the hearing as Government Exhibit 4.

16. Several officers, including Helton and Agent Muse, then proceeded to execute the search warrant. During the execution of the warrant, Agent Muse found the burglary suspect, later identified as Devin Mason, hiding behind a big dresser in an open room on the first floor.

17. Mason later told officers that he had initially been hiding in a closet under a pile of clothes, and he came out a couple of times to see if he could escape, at which point he saw that the officers were still outside the residence. He then hid in the location where he was eventually found by Muse during the execution of the search warrant.

18. The marijuana plants and firearms which are the subject of the indictment in this case were all found during the execution of the search warrant.

---

[4] The last paragraph of the affidavit contains a factual error. More specifically, the affidavit says that the warrant be issued to further the Affiant's continuing investigation of "impersonating a police officer." Officer Schihl explained that he did not tell the Assistant Commonwealth Attorney to include that in the affidavit. After hearing Schihl's explanation at the hearing, the Court concludes that was a typo, likely from a previous template that was used for a previous affidavit. That error does not impact the Court's analysis in any way.

### III. ANALYSIS

**A.    The officers properly entered Defendant's home**[5]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  The "chief evil" the Fourth Amendment guards against is the government's physical entry into the home; therefore, warrantless entries and searches inside a home are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585-86 (1980).  However, police may reasonably enter a home without a warrant when there is an exigent circumstance. *Mincey v. Arizona*, 437 U.S. 385, 394 (1978).

When officers have probable cause to believe a burglary is in progress, there is an exigent circumstance that justifies a warrantless entry into the home. *United States v. Brown*, 449 F.3d 741, 747 (2006).  This exception is based on the common sense rationale that "it would defy reason to suppose that [an officer] had to secure a warrant . . . leaving the putative burglars free to complete their crime unmolested." *United States v. Johnson*, 9 F.3d 506, 509 (6th Cir. 1993).  To determine whether the officers had probable cause, a reviewing court considers the "totality of the circumstances" to arrive at a "common-sense" conclusion whether there was a "fair probability" a burglary was in progress. *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

In this case, the officers had probable cause to believe that a burglar was inside the Defendant's home.  The officers received a dispatch call that a concerned citizen had made

---

[5] Defense counsel indicated at oral argument that he did not contest the officers' initial entry into the residence.  However, because it provides context for the remainder of the analysis, the Court will analyze whether that entry was proper.

a 911 call reporting a suspicious person on Mills Road, a location where there had been a recent string of burglaries. After arriving and checking what turned out to be the incorrect house, the officers spoke face-to-face with the neighbor who had made the 911 call. The neighbor told the officers that a suspicious male had been walking around the front door of the Defendant's home (3277 Mills Road). He also alerted the officers to a vehicle across the street, and explained that both the vehicle and male were "out of the ordinary" for the area. The officers then discovered that both the front and back door of Defendant's home were unlocked. Based on this information, the officers had probable cause to believe that a burglary was in progress, and therefore an exigency justified their entry into the home.

**B. The smell of marijuana was within the officers' plain view and properly included in the affidavit**

Officers can permissibly include in a search-warrant affidavit any observation they make in "plain view." *See United States v. Hinojosa*, 606 F.3d 875, 884-85 (6th Cir. 2010) ("Because everything that the officers observed was in plain view . . . those observations were properly included in the affidavit."). An observation is made in plain view when it occurs from a "lawful position" and does not involve a "constitutionally improper search." *Id.* at 885.

As discussed above, the officers were permitted to enter the Defendant's home to search for the reported prowler. Upon doing so, both officers immediately noticed a "strong" smell of marijuana. The officers did not seize any evidence nor manipulate any of the Defendant's property in making this observation. *See Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987) (finding a Fourth Amendment search when an officer moved a speaker to reveal the serial number). Because the officers were in a permissible location and did

7

not conduct an improper search in detecting the marijuana's smell, that observation was properly included in the search-warrant affidavit. *Horton v. California*, 496 U.S. 128, 133 (1990) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.").

**C.     The officers were permitted to conduct a protective sweep of the home**

When officers enter a home based upon probable cause that a burglary is in progress, there are potentially two independent reasons justifying a protective sweep of "places in which a person might be hiding." *See Johnson,* 9 F.3d at 510.  First, to apprehend the suspect and "secure the premises to prevent the loss or destruction of the owner's property." *Id.*  And second, to ensure officer and victim safety, when there are "articulable facts . . . that would warrant a reasonably prudent officer in believing" that a dangerous individual is on the scene.  *See Maryland v. Buie*, 494 U.S. 325, 334 (1990).

Both justifications were present here.  First, as discussed above, the officers had reasonable suspicion that a burglar was inside the Defendant's home.  Therefore, they were permitted to sweep the premises in order to detain the suspect and to prevent the theft of the homeowner's (in this case the Defendant's) property.  *Johnson*, 9 F.3d at 510; *Brown*, 449 F.3d at 550.  Second, the officers were permitted to sweep the house for their own safety, as well as any potential victim's safety.  An in-progress burglary is an inherently dangerous situation.  See *James v. United States*,  550 U.S. 192, 203 (2007) ("The main risk of burglary arises . . . from the possibility of a face-to-face confrontation between the burglar and a third party – whether an occupant, a police officer, or a bystander – who comes to investigate.").  Because this was a *home* invasion – as opposed to one involving an abandoned warehouse – there was a reasonable likelihood that a victim may have been

8

on the scene. Although the initial search of the first two floors did not indicate a victim was present, the officers conducting the sweep had no way of knowing that beforehand. Thus, it was proper for the officers to conduct a protective sweep of the Defendant's home.

**D.      The officers did not exceed the scope of the sweep by entering the basement**

In most situations, when an officer conducts a protective sweep of a house in response to a potential burglary, it is both permissible and reasonable for that officer to search the home's basement. *See Brown*, 449 F.3d at 750 (holding that when police respond to a suspected burglary "exigent circumstances justif[y] the brief and cursory inspection of the premises, including . . . the basement where an intruder could be hiding or a resident restrained."). However, the Defendant argues that the officers exceeded the scope of their search by entering the basement. He insists that the officers should have known that the burglar was not in the basement because of the double layer of carpet over the trap door.

The Fourth Amendment requires the officers to have been reasonable – not correct – in determining that the suspect was potentially in the basement. *Buie*, 494 U.S. at 327-28. And because the officers were responding to a potential crime in progress, "their judgment[] should be afforded an extra degree of judicial deference." *Johnson*, 9 F.3d at 510 (quoting *Reardon v. Wroan*, 811 F.2d 1015, 1030 (7th Cir. 1987)). The officers testified that upon entering the house they searched the ground floor and did not find the suspect. They did believe, however, that the house had a basement because they had observed low-level windows while walking around the house's perimeter. With the basement the only floor left to clear, they noticed the suspicious alcove with a double-layer of carpet. The carpet's presence may have made it *less likely* that the burglar was in the

9

basement; but at the same time, the officers' failure to locate the suspected prowler during their initial sweep of the first floor made it *more likely* that he was in the basement.

This is not a situation where the officers searched or entered a location where it was immediately apparent the suspect could not have been hiding – like a drawer or behind a boarded-up door. Rather, the officers had to examine the carpet, determine whether it was connected to the trap door, and then search for any possible means the intruder could have used to reposition the carpet. To the extent that they engaged in this analysis, both officers testified that they thought it was probable the suspect was hiding in the basement. Under the facts of this case, second guessing their decision would do little to further privacy rights, but go a long way towards jeopardizing police and victim safety. *Johnson*, 9 F.3d at 510 ("[T]he important responsibility of the police to investigate reported burglaries must be balanced against the serious invasions of privacy such searches entail."); *Buie*, 449 U.S. at 331 ("[I]n determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."). Because the officers were reasonable in concluding that the suspect might have been hiding in the basement, they did not exceed the scope of the search.

E.   **The officers' observation of the marijuana plants was properly included in the affidavit**

Because the officers were legally permitted to enter the basement, their observation of the marijuana plants – like the smell of those plants – was in plain view. *Hinojosa*, 606 F.3d at 884-85. The officers testified that they observed small marijuana plants immediately upon entering the basement. They then noticed a wall of plastic sheeting, which they thought a person could have been hiding behind. While searching behind the

wall, the officers saw several additional, larger marijuana plants. Because the officers were in a lawful place and were conducting a lawful sweep of the basement, their observation of the marijuana plants was properly included in the affidavit.

**F.     Even if the officers exceeded the scope of the search, their initial smell of marijuana was sufficient to secure a search warrant**

Even assuming *arguendo* that the officers exceeded the scope of the search by entering the basement, their initial smell of marijuana provided a sufficient basis for a search warrant, and therefore suppression would be inappropriate. Under the independent source doctrine, illegitimately obtained information in a search-warrant affidavit does not *per se* pollute the warrant. *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005). So long as the legitimately obtained information in the affidavit is sufficient on its own to establish probable cause, the warrant is valid. *Id.* This is so because, "[i]nvalidating a search warrant . . . when the warrant would have been granted even without the tainted information, would put the police in a worse position than they would have been in had they not presented the tainted information to the magistrate." *Id.* at 758-59.

Both officers testified that they noticed a "strong" smell of marijuana upon entering the house. As discussed above, under the plain view (smell) doctrine, that evidence was properly included in the search-warrant affidavit. Therefore, even if the Court excises the information the officers obtained after entering the basement, the affidavit still states the following:

> When the officers approached the residence they noticed that both the front and side doors were unlocked and unsecured. Upon notifying dispatch of the unsecured door, the officers entered the house to clear the residence. Once inside the house, the officers *smelled a strong odor of marijuana*. While securing the residence, the officers also located a plastic jug with electrical devices and plastic tubing sticking out.

11

(Doc. # 16, Ex. B).

An officer's smell of marijuana in an automobile is sufficient by itself to establish probable cause for a search. *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002). "The same may be true when marijuana is smelled within a home." *Id.* (citing *United States v. Tobin*, 923 F.2d 1506, 1512 & n. 4 (11th Cir. 1991); 2 LaFave, *Search and Seizure* § 3.6(b), at pp. 290–92; *United States v. Gonzalez*, No. 94–6503, 1995 WL 626286, at *3 (6th Cir. Oct. 24, 1995) (unpublished opinion) (per curiam) (holding that smell of marijuana alone created probable cause for roadside search of a motor home)); *Johnson v. United States*, 333 U.S. 10, 13 (1948) ("If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, [the United States Supreme Court] has never held such a basis insufficient to justify issuance of a search warrant.").

Here the affidavit states that both officers recognized a "strong" odor of marijuana upon entering the Defendant's home. This information, by itself, was probable cause for the magistrate to issue the warrant. Therefore, even if the officers violated the Defendant's Fourth Amendment rights by entering his basement, the warrant was valid and expressly permitted the officers to search for and seize the marijuana plants.

**G.  The assault rifle was properly seized**

In addition to the marijuana, Defendant moves to suppress an assault rifle seized from his home. In his Motion, Defendant suggests that the assault rifle was seized prior to the police obtaining a search warrant.

However, both officers who conducted the initial sweep of the house testified that they did not remember seeing a gun. Despite Defendant's suggestion to the contrary, the

assault rifle was seized during the execution of the valid search warrant.

Because the police had a valid warrant to search the home for marijuana, any "immediately apparent" contraband they discovered during the permissible scope of the search was also subject to seizure. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) ("An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character."). An object's illegality is immediately apparent when there is probable cause to believe the object is associated with criminal activity. *United State v. McLevain*, 310 F.3d 434, 441 (6th Cir. 2002).

Both under Kentucky state law, KRS § 218A.992, and federal law, 18 U.S.C. § 924(c)(1)A), it is illegal to possess a firearm in furtherance of committing a drug trafficking offense. A weapon is used in furtherance of a crime when it is "strategically located so that it is quickly and easily available for use." *United States v. Mackey*, 265 F.3d 457, 460-61 (6th Cir. 2001). The assault rifle was discovered in the Defendant's home, which is also where the grow operation was located. Because the gun's location gave probable cause to believe that it was used during the commission of a drug trafficking offense, it was properly seized under the plain view doctrine. Accordingly, Defendant's motion to suppress the assault rifle is denied.

Accordingly, **IT IS ORDERED** as follows:

(1) Defendant's Motion to Suppress (Doc. # 16) is **DENIED**.

(2) The time period between October 29, 2014 and the date of the entry of this Order, totaling twenty-eight (28) days, is excluded from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D) & (H).

This 26th day of November, 2014.



Signed By:
David L. Bunning    DB
United States District Judge

G:\DATA\Opinions\Covington\2013\13-2 MOO denying mtn to suppress.wpd